McMillan v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

(Argued: October 11, 2012    Decided: March 4, 2013)

Docket No. 11-3932

-------------------------------------------------------x

RODNEY MCMILLAN,

     Plaintiff-Appellant,

                         -- v. --

CITY OF NEW YORK,

     Defendant-Appellee.[1]

-------------------------------------------------------x

B e f o r e :   WALKER, LIVINGSTON, and DRONEY, Circuit Judges.

     Plaintiff-Appellant Rodney McMillan appeals from the August 23, 2011 order of the United States District Court for the Southern District of New York (Jed S. Rakoff, Judge) granting Defendant-Appellee the City of New York's motion for summary judgment. We hold that the district court's grant of summary judgment with regard to the disability discrimination claim and failure to accommodate claims was based on an incomplete factual analysis. VACATED and REMANDED.

                         MICHAEL G. O'NEILL, New York, NY,
                         for Plaintiff-Appellant.

---

[1] The Clerk is directed to update the case's caption to reflect the corrected spelling of the plaintiff-appellant's name.

JANET L. ZALEON (Michael A. Cardozo, Kristin M. Helmers, Andrea O'Connor, on the brief), Corporation Counsel of the City of New York, New York, NY, for Defendant-Appellee.

JOHN M. WALKER, JR., Circuit Judge:

One of the central goals of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., is to ensure that, if reasonably practicable, individuals are able to obtain and maintain employment without regard to whether they have a disability. To accomplish this goal, the ADA requires that employers provide reasonable accommodations to qualified individuals. See id. § 12112(b)(5). This case highlights the importance of conducting a fact-specific analysis in ADA claims.

It is undisputed that Rodney McMillan's severe disability requires treatment that prevents him from arriving to work at a consistent time each day. In many, if not most, employment contexts, a timely arrival is an essential function of the position, and a plaintiff's inability to arrive on time would result in his failure to establish a fundamental element of a prima facie case of employment discrimination. But if we draw all reasonable inferences in McMillan's favor—as we must at summary judgment—it is not evident that a timely arrival at work is an essential function of McMillan's job, provided that he is able to

2

offset the time missed due to tardiness with additional hours worked to complete the actual essential functions of his job.

In our view, the United States District Court for the Southern District of New York (Jed S. Rakoff, Judge) did not conduct a sufficiently detailed analysis of the facts that tend to undermine the City's claim that a specific arrival time is an essential function of McMillan's position before granting summary judgment for the City. VACATED and REMANDED.

## BACKGROUND

McMillan has schizophrenia, which is treated with calibrated medication. Despite this impairment, McMillan worked for ten years as a case manager for the City's Human Resources Administration ("HRA") before assuming his present role in 1997 as a case manager for the HRA Community Alternative Systems Agency ("CASA"). McMillan's current job duties include conducting annual home visits, processing social assessments, recertifying clients' Medicaid eligibility, making referrals to other social service agencies, and addressing client concerns. He also meets with clients daily in the office.

CASA's flex-time policy allows employees to arrive at the building anytime between 9:00 and 10:00 a.m. Due to elevator wait times, they are not considered late unless they arrive at the office after 10:15 a.m. When an employee is late, the tardiness can be approved or disapproved by a supervisor. When a tardiness is

approved, an employee may apply accumulated annual leave, sick leave, or other "banked time" (i.e., additional hours worked) to cover the time missed due to the late arrival and still be paid in full. If the employee does not have or does not wish to use his banked time, the time prior to the late arrival is unpaid. Under their collective bargaining agreement, CASA employees are required to take a one-hour break for lunch unless they receive prior approval to work overtime through lunch, and under CASA's flex-time policy, they may leave between 5:00 and 6:00 p.m. CASA employees are expected to work approximately 35 hours per week, excluding their one-hour break for lunch.

Although McMillan testified that he usually wakes between 7:00 and 7:30 a.m., his morning medications make him "drowsy" and "sluggish." As a result, he often arrives late to work, sometimes after 11:00 a.m. The City makes no allegations that McMillan malingers; instead, it is undisputed that his inability to arrive at work by a specific time is the result of the treatment for his disability.

Prior to 2008, and for a period of at least ten years, McMillan's tardy arrivals at CASA were either explicitly or tacitly approved. At some time in 2008, his supervisor Loshun Thornton, at her supervisor Jeanne Belthrop's direction, refused to approve any more of McMillan's late arrivals. As explanation, Thornton stated

that she "wouldn't be doing [her] job if [she] continued to approve a lateness every single day."

After Thornton stopped approving his late arrivals, McMillan repeatedly made verbal requests for a later start time to avoid being disciplined for tardiness. Thornton informed McMillan that a later start time would not be possible because he could not work past 6:00 p.m. without a supervisor present.

On June 9, 2008, Thornton and Belthrop held a "supervisory conference" with McMillan to discuss his continued tardiness. A memorandum describing the meeting noted that his late arrivals were due to his medication. The memorandum also noted Thornton's request that McMillan speak with his treating physician to determine if his schedule could be altered. In October and December, his treating psychiatrist wrote two letters stating that McMillan's medication schedule should not be altered.

On May 8, 2009, McMillan was fined eight days' pay for his late arrivals. In December 2009, Belthrop recommended additional disciplinary action in light of McMillan's "long history of tardiness." In March 2010, the City brought charges of "Misconduct and/or Incompetence" against McMillan. On April 22, 2010, in a Step II grievance hearing resulting from the March 2010 charges, a City representative recommended that McMillan's employment be terminated. McMillan's union representative argued that there were mitigating circumstances due to McMillan's disability.

On March 23 and April 22, 2010, McMillan formally requested accommodations for his disabilities,[2] including a later flex start time that would permit him to arrive at work between 10:00 a.m. and 11:00 a.m. These requests were forwarded to Donald Lemons, the Deputy Director of HRA's Equal Employment Opportunity Office, for evaluation. After speaking with Thornton and others, but not with McMillan, Lemons determined that McMillan's request for a later flex start time could not be accommodated because there was no supervisor at the office after 6:00 p.m. Ultimately, the City reduced the recommended sanction of termination to a thirty day suspension without pay.

Contending that the City's response to his request for accommodations was insufficient, McMillan brought suit alleging violations of the ADA, the New York State Human Rights Law, N.Y. Executive Law § 290, et seq., and the New York City Human Rights Law, N.Y.C. Administrative Code § 8-101, et seq. McMillan alleged that he often worked past 7:00 p.m. and that the office is open until 10:00 p.m., so that he could arrive late and still work 35 hours per week. Alternatively, McMillan asserted that he would be willing to work through lunch to bank time. McMillan argued that

---

[2] In addition to his schizophrenia, McMillan was also born without a left arm, and therefore he requested a headset for voice activation software and a reduced caseload. The parties dispute the adequacy of the City's response to these requests. The district court dismissed these claims as well.

these suggested accommodations would allow him to complete the essential functions of his position.

On August 23, 2011, the district court granted summary judgment for the City and dismissed all of McMillan's claims with prejudice. After noting that it could not distinguish between absenteeism and tardiness, the district court observed that a court was "required to give considerable deference to the employer's judgment and its general policies" in "determining whether the ability to arrive at work within a designated time period with some degree of consistency is an essential function of plaintiff's job." McMillan v. City of New York, No. 10 Civ. 4806 (JSR), 2011 WL 5237285, at *5, *6 (S.D.N.Y. Aug. 23, 2011). Because the City "determined that an ability to consistently arrive at work within a one-hour time frame is a fundamental requirement of plaintiff's position," the district court granted summary judgment to the City "on the ground that plaintiff cannot state a prima facie case of disability discrimination because he has failed to demonstrate that he could perform the essential functions of his job with or without reasonable accommodation." Id. at *6. As an alternative basis for its holding, the district court found that McMillan could not demonstrate that the City's legitimate business reason for his discipline—his repeated tardiness—was pretext for discrimination.

The district court also dismissed McMillan's claims that the City failed to provide him with reasonable accommodations. The

7

district court concluded that McMillan's request for a later start time was "unreasonable as a matter of law because [he] has failed to demonstrate that he would be able to arrive at work on time even if he were granted a later flex starting time." Id. at *7.

**DISCUSSION**

On appeal, McMillan challenges the district court's findings (1) that arriving at work by 10:15 a.m. was an essential function of his job; (2) that he was unqualified because of his tardiness, which was undisputedly a result of his disability; (3) that his requested accommodations were unreasonable; and (4) that his other failure to accommodate claims were without merit. "We review an award of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in his favor." McElwee v. Cnty. of Orange, 700 F.3d 635, 640 (2d Cir. 2012).

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009). In accordance with this familiar standard,

> [t]o establish a prima facie case under the ADA, a
> plaintiff must show by a preponderance of the evidence
> that: (1) his employer is subject to the ADA; (2) he was
> disabled within the meaning of the ADA; (3) he was
> otherwise qualified to perform the essential functions of

8

his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (quotation marks omitted). The parties do not dispute the first, second, or fourth elements. The district court's decision turned on its analysis of the question presented by the third: whether McMillan was "otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation." Id.

An employer may also violate the ADA by failing to provide a reasonable accommodation. A plaintiff states a prima facie failure to accommodate claim by demonstrating that

(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

McBride, 583 F.3d at 97 (quotation marks omitted).

In discrimination claims based both on adverse employment actions and on failures to accommodate, the plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment." Id. at 97; Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 137-38 (2d Cir. 1995).

9

## I.   Determining the Essential Functions of a Position

Although a court will give considerable deference to an employer's determination as to what functions are essential, there are a number of relevant factors that may influence a court's ultimate conclusion as to a position's essential functions. Stone v. City of Mt. Vernon, 118 F.3d 92, 97 (2d Cir. 1997) (stating that relevant factors to consider include the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions (citing 29 C.F.R. § 1630.2(n)(2))). "Usually, no one listed factor will be dispositive." Id. A court must avoid deciding cases based on "unthinking reliance on intuition about the methods by which jobs are to be performed." Borkowski, 63 F.3d at 140. Instead, a court must conduct "a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." Id.

The district court appears to have relied heavily on its assumption that physical presence is "an essential requirement of virtually all employment" and on the City's representation that arriving at a consistent time was an essential function of McMillan's position. While the district court's conclusion would be unremarkable in most situations, we find that several relevant

10

factors here present a somewhat different picture: one suggesting that arriving on or before 10:15 a.m.—or at any consistent time—may not have been an <u>essential</u> requirement of McMillan's particular job. For many years prior to 2008, McMillan's late arrivals were explicitly or implicitly approved. Similarly, the fact that the City's flex-time policy permits all employees to arrive and leave within one-hour windows implies that punctuality and presence at precise times may not be essential. Interpreting these facts in McMillan's favor, along with his long work history, whether McMillan's late and varied arrival times substantially interfered with his ability to fulfill his responsibilities is a subject of reasonable dispute.

This case highlights the importance of a penetrating factual analysis. Physical presence at or by a specific time is not, as a matter of law, an essential function of all employment. While a timely arrival is normally an essential function, a court must still conduct a fact-specific inquiry, drawing all inferences in favor of the non-moving party. Such an inquiry was not conducted here.[3]

---

[3] The district court could not "discern a principled distinction between total absence from work on certain days and partial absence from work on most days," because "the fundamental problem is that the employee is not physically present at the job site, an essential requirement of virtually all employment." <u>McMillan</u>, 2011 WL 5237285, at *5. However, there is an important distinction between complete absence and tardiness in jobs that require work to be done at the office: an absent employee does not complete his

11

The City and district court relied on cases that are distinguishable, because the plaintiffs' positions in those cases absolutely required plaintiffs' presence during specific business hours. The plaintiffs' requested accommodations of flexible start times would have therefore impaired an essential function of their jobs. See Guice-Mills v. Derwinski, 772 F. Supp. 188, 199 (S.D.N.Y. 1991), affirmed, 967 F.2d 794, 798 (2d Cir. 1992) (finding that "an administrative shift commencing at 7:30 or 8:00 a.m. was an essential requirement of the head nurse position" because the plaintiff was a head nurse who supervised others); Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir. 1994) (finding that a flexible arrival time would not allow plaintiff to meet a specific 4:00 p.m. daily deadline and that the failure to make this deadline would constitute an undue hardship to the employer). These cases do not hold that, as a matter of law, a specific starting time is an essential function of all jobs. Indeed, the D.C. Circuit has

work, while a late employee who makes up time does. Similarly, while it may be essential in many workplaces that all tasks be performed by employees who are both physically present and supervised, these requirements are not invariably essential. Thus, depending on the requirements of the position, an employee might need to be physically present and supervised only for certain tasks. By way of example, and without expressing any view on the question, it might be necessary for a supervisor to be present when McMillan meets with clients in the office, but not when he fills out forms. The district court appears to have simply assumed that McMillan's job required at least seven hours of work each day and that the work could not be successfully performed by banking time on some days to cover tardiness on others, while working a total of at least 35 hours each week. A fact-specific inquiry, however, requires consideration of this possibility on remand.

12

distinguished <u>Carr</u> in finding that certain requests for flexible schedules are not unreasonable as a matter of law. <u>See, e.g.</u>, <u>Breen v. Dep't of Transp.</u>, 282 F.3d 839, 843 (D.C. Cir. 2002); <u>see also</u> <u>Ward v. Mass. Health Research Inst., Inc.</u>, 209 F.3d 29, 34-35 (1st Cir. 2000) (noting that the employer bears the burden of demonstrating that a regular and reliable schedule is an essential job function).

On the present record, it appears to us that a reasonable juror could find that arriving at a specific time was not an essential function of the case manager position, provided that McMillan still would be able to complete his work in a sufficiently timely fashion. Accordingly, on the present record, the district court erred in concluding that summary judgment was appropriate on this basis.

## II.  Performance of Essential Functions

After the essential functions of the position are determined, the plaintiff must demonstrate that he or she could have performed these functions, with or without reasonable accommodation, at the time of the termination or discipline. <u>See</u> <u>Borkowski</u>, 63 F.3d at 137-38. This burden is not heavy: "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." <u>Id.</u> at 138. "Reasonable accommodations" may include adjustments to work schedules or other job restructuring. <u>See</u> 45 C.F.R. § 84.12(b)

13

(2005). Of course, "[a] reasonable accommodation can never involve the elimination of an essential function of a job." Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003).

McMillan has suggested that he could work through lunch and work late in order to "bank" time. If his lunchtime overtime and tardy arrivals were approved, he would then be able to apply this banked time against future late arrivals. On this record, and drawing all inferences in McMillan's favor, we conclude that McMillan has suggested a plausible accommodation, meeting his burden at this stage of the analysis.

**III. Undue Hardship**

If a plaintiff suggests plausible accommodations, the burden of proof shifts to the defendant to demonstrate that such accommodations would present undue hardships and would therefore be unreasonable. See Borkowski, 63 F.3d at 135, 138. An "undue hardship" is "an action requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A).

The City already has a policy of allowing employees to "bank" any hours they work in excess of seven hours per day and apply banked time against late arrivals, provided that those late arrivals are approved. Because there is no evidence that pre-approving McMillan's tardiness would constitute an undue burden on

14

the City, the question is whether McMillan would be able to bank sufficient time to cover his late arrivals.

The district court correctly concluded that assigning a supervisor to work past 6:00 p.m. would constitute an undue hardship. However, McMillan was presumably unsupervised when he made home visits for his clients or when he worked past 7:00 p.m. It is unclear from this record whether his home visits or after-hours work was supervised and, if not, whether McMillan could bank these unsupervised hours.[4]

Even if McMillan could not bank post-6:00 p.m. time, he also states that he would be willing to work through his one-hour lunch. The City has a policy, based on a collective bargaining agreement, of not allowing employees to work through lunch unless they receive advanced approval. The district court concluded, without further

_____

[4] McMillan's request to work unsupervised after 6:00 p.m. is not unlike a request to work from home. Both accommodations are potentially problematic because they are unsupervised. We have implied, however, that unsupervised work might, in some cases, constitute a reasonable accommodation. See Nixon-Tinkelman v. N.Y.C. Dep't of Health & Mental Hygiene, 434 F. App'x 17, 20 (2d Cir. 2011) (summary order) (remanding to the district court to consider, inter alia, whether it would have been reasonable for the defendants to have allowed plaintiffs to work from home); DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 104 (2d Cir. 2010) (suggesting that employer had provided a reasonable accommodation by allowing employee to work from home). The majority of cases on this issue, however, find that requests to work without supervision are unreasonable. See Konspore v. Friends of Animals, Inc., No. 3:10cv613 (MRK), 2012 WL 965527, at *12 (D. Conn. Mar. 20, 2012) (citing cases). The question of whether McMillan can reasonably perform portions of his job without supervision, as he apparently has been permitted to do previously, should be considered on remand.

explanation, that "plaintiff's proposed accommodation could not have been accommodated without undue hardship." McMillan, 2011 WL 5237285, at *8 n.5. We disagree. On the limited record before us, such pre-approval does not strike us as "requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A).

Additionally, although the parties do not discuss this in their briefs, it might be the case that on some days McMillan would be able to arrive (relatively) early. If he also worked through lunch or stayed through 6:00 p.m. on those days, he would be able to bank that time against future tardiness as well.

On the present record, we cannot find as a matter of law that McMillan's suggested accommodations would constitute undue hardships to the City and are therefore unreasonable.[5] Accordingly, McMillan states a prima facie case of discrimination based on his disability and, at least with regard to his late arrivals,[6] a prima facie case for failure to provide accommodations.

---

[5] The district court found McMillan's request to arrive by 11:00 a.m. "unreasonable as a matter of law because plaintiff has failed to demonstrate that he would be able to arrive at work on time even if he were granted a later flex starting time." McMillan, 2011 WL 5237285, at *7; see also McBride, 583 F.3d at 99-101. This analysis, however, is based on the district court's faulty assumption that no disputed factual issues exist as to whether a timely arrival was an essential function of the case manager position.

[6] McMillan also brings failure to accommodate claims with regard to his request for software training and a reduced caseload. On remand, the district court should reconsider these claims in light of this opinion.

16

As a final matter, the district court found that, even if McMillan could state a prima facie case of discrimination, he could not demonstrate that the City's legitimate business reason for disciplining him—his repeated tardiness—was pretextual.

While the burden-shifting McDonnell Douglas analysis is useful in most discrimination cases, it is not helpful here. When the reason given by the employer for the adverse employment action is unrelated to the employee's disability, the McDonnell Douglas approach can be used to weed out non-viable claims of discrimination based on circumstantial evidence. When the parties agree that the employer complains of conduct that is the direct result of the employee's disability, however, there is no need to evaluate whether the employer's adverse employment action made in response to that conduct is pretextual. See Teahan v. Metro-N. Commuter R.R. Co., 951 F.2d 511, 514, 516 (2d Cir. 1991).

Here, it is undisputed that McMillan was tardy because of his disability and that he was disciplined because of his tardiness. In other words, McMillan was disciplined because of his disability. Pretext is not an issue in this case; instead, McMillan need only demonstrate that, with reasonable accommodations, he could have performed the essential functions of his job.

For the reasons given above, on this record, we cannot conclude that a reasonable juror would find McMillan's claims to be without merit. If the factual record is developed further, some or

17

all of McMillan's claims may not survive summary judgment. On the record before us, however, dismissal is premature.

## CONCLUSION

For the foregoing reasons, the district court's order granting summary judgment to the City with regard to the federal, state, and city law claims is VACATED and the case is REMANDED for further proceedings consistent with this opinion.